**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PATRICK OTIS NELSON, | Case No. 09-CV-00140 MSB |
| Plaintiff, | **ORDER** |
| vs. | |
| CALIFORNIA DEPARTMENT OF CORRECTIONS, et al., | |
| Defendants. | |

On January 15, 2009, Plaintiff Nelson filed a *pro se* complaint pursuant to 42 U.S.C. § 1983, charging Defendant Peck with, among other things, violating his rights under the Eighth Amendment. Nelson's complaint arises out of a strike that broke out at the California State Prison at Solano in January of 2008. Peck's motion for summary judgment in response to that claim, submitted on November 9, 2011, is hereby GRANTED.

**I. Factual and Procedural History**

On January 7, 2008, at 3:30 a.m., 33 inmates assigned to work in the kitchen of the California State Prison at Solano refused to work. That was the beginning of what turned out to be a four day strike, organized in protest against changes to the prison's recreation schedule. Defendant's Statement of Undisputed Facts (DUF) 16. By the middle of the first day, virtually all Level III inmates were refusing to work. DUF 17, 18. Defendant Peck, a Correctional Captain at Solano, responded to the strike by ordering all inmates to return to work and informing them that if they did not, they would receive a disciplinary write-up (a "115"). DUF 23.

On the first morning of the strike, Peck held a meeting with the prison's educational staff and requested that they inform inmates of the consequences of not reporting to work. DUF 23. Michael J. Rogers, an instructor in the prison's Vocational Printing and Graphic Arts program, was at the meeting, and voiced concerns that inmates who crossed the "picket line" would face violent retaliation from those on strike. Rogers'Aff. ¶ 2. Peck responded that "the effects of prison politics was not [their] concern." Rogers' Aff. ¶ 4. John Steffan, a representative of the prison's Mens Advisory Council, asked Peck whether he could guarantee inmates' safety. Steffan Aff. ¶ 1. Peck's response was that he could not. Steffan Aff. ¶ 1.

After the meeting, inmates were notified of the consequences of not reporting to work through the prison's loudspeakers and by work supervisors moving cell-to-cell. DUF 24, 25.

Nelson and fellow inmate Steve Prellwitz state that during the strike, protesting prisoners threatened violence against anyone who crossed the picket line and reported to work. Prellwitz Aff. ¶ 1, Nelson Aff. ¶ 1. Prellwitz reported to work; he says that on his way to and from work picketing prisoners shouted violent threats at him. Prellwitz Aff. ¶ 1. Prisoners also directed violent threats towards staff members. DUF 26, Novinger Aff. ¶ 1.

The next day, January 8, Warden Sisto requested a declaration of a State of Emergency, which was approved that day. DUF 33, 34. After the strike ended on January 11, a risk assessment was undertaken which "continued over several days." DUF 40–46. The prison began "an incremental unlock" on January 15 and remained under a State of Emergency until February 7. DUF 47–51.

Nelson refused to work during the strike and, after a disciplinary hearing, was issued a 115. DUF 58. His punishment included losing 30 days of "worktime credits," losing Friday visit privileges for 90 days, and losing "Privilege Group A1-C status" for 90 days. Rules Violation Report, Compl. Ex. G. On January 15, 2009, Nelson filed a pro se complaint in this court

alleging three counts (1) "attempted murder," (2) "perjury/forgery/falsification of official documents," and (3) destruction of evidence. On November 23, 2009, this Court entered a screening order granting Nelson's motion to proceed in forma pauperis and ordering an answer as to Count 1, construed as an Eighth Amendment claim. Counts 2 and 3 were dismissed. *Nelson v. Cal. Dept. of Corrections, et al.*, No. 2:09-cv-00140-MSB, 2009 WL 4456563 (E.D. Cal. Nov. 4, 2009). Peck filed an answer asserting qualified immunity, and the parties conducted discovery, after which cross-motions for summary judgment were filed.

## II. Standard of Review

Summary judgment is appropriate if "[Peck] shows that there is no genuine issue of material fact and that [Peck] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" if it "might affect the outcome of the suit under governing law. . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

As the moving party, Peck has the burden of establishing the absence of a genuine issue of material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), and Nelson, the non-moving party, has a duty to present affirmative evidence if he is to defeat a properly supported motion for summary judgment.

- 4 -

*Anderson*, 477 U.S. at 257. The court must view the evidence in the light most favorable to the nonmoving party. *Id*. at 249.

### III.  Eighth Amendment Claim

The Eighth Amendment prohibits the imposition of cruel and unusual punishment and "embodies 'broad and idealistic concepts of dignity, civilized standards, humanity and decency.'" *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (quoting *Jackson v. Bishop*, 404 F.2d 571, 579 (8th Cir. 1968)).  Prison "[c]onditions must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). This "imposes duties on [prison] officials . . . [to] ensure that inmates receive adequate food, clothing, shelter and medical care, and . . . 'take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–527 (1984)).   These duties include an "obligation to take reasonable steps to protect inmates from violence at the hands of other inmates." *Goka v. Bobbitt*, 862 F.2d 646, 649 (9th Cir. 1988) (quoting *Hudson*, 468 U.S. at 526–27).

"[A] prison official," however, "cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or

safety." *Farmer*, 511 U.S. at 837.  This standard contains both subjective and objective elements.

**A.  The subjective prong**

Under the subjective test, the prisoner must show that the prison official had "a 'sufficiently culpable state of mind,'" one that amounts to "'deliberate indifference' to inmate health or safety.'" *Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).  Deliberate indifference is when a prison official "knows of and disregards an excessive risk to inmate health or safety." *Id.* Notably, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

Viewing the evidence in the light most favorable to Nelson, Peck arguably knew there was some risk of serious harm to inmates who crossed the picket line.  During the meeting on the first morning of the strike, Peck was warned of the risk by staff members and responded that "prison politics" was not their concern.  Rogers' Aff. ¶ 4.  He also admitted that he could not guarantee inmates' safety.  Steffan Aff. ¶ 1.  Prison officials also organized a risk assessment immediately following the end of the strike, which continued over several days,  DUF 41-44, indicating that Peck was aware that some threat of violence existed.

- 6 -

But Peck and the staff organized a cautious and safe return to normalcy after the strike. DUF 47-52. During the strike "approximately 2,162 Level III general population inmates were on modified program. All inmates remained in their cells . . . except those inmates who reported to work." DUF 52. After the strike, "prison officials began an incremental unlock" on January 15, and the prison remained in a State of Emergency until February 7, 2008. DUF 51. Prison staff began a risk assessment on January 11, the same day the strike ended, to assess the risk of retaliation to those inmates who followed Peck's orders. DUF 41. That assessment "continued over several days" and included interviews with those inmates who expressed concern for retaliation against those who reported to work. DUF 44. These steps indicate that Peck demonstrated anything but "deliberate indifference" to the threat, but instead took numerous precautions to ensure inmates' safety. *See Farmer*, 511 U.S. at 834.

## A. The objective prong

Under the objective prong, the prisoner must show that the "deprivation . . . is, objectively, 'sufficiently serious.'" *Farmer*, 511 U.S. at 834 (quoting *Wilson*, 501 U.S. at 298). In cases involving an alleged breach of the duty to protect prisoners from violence at the hands of other prisoners, "the inmate

must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Id*. at 833.

Nelson claims that by threatening him with a disciplinary warning for failure to report to work, Peck exposed him, by force, to a substantial risk of serious harm. Compl. at A. He asserts that had he crossed the picket line, he would have faced a substantial risk of violent retaliation from other prisoners. Nelson's argument suffers from major flaws under this prong of the analysis.

First, even if Nelson had crossed the picket line, the evidence does not show that he would have faced a substantial risk of harm. Nelson and Prellwitz both attest to violent threats made against them, Prellwitz Aff. ¶ 1, Nelson Aff. ¶, but Prellwitz did return to work and suffered no serious harm. While Prellwitz claims in his affidavit that he was assaulted for crossing the picket line, Prellwitz Aff. ¶ 2, a subsequent medical report, which he signed, "indicated [that he] did not have any injuries consistent with being a victim of battery." He also "stated [he] did not have any safety concerns . . . ." Compl. Ex. F. Indeed, Nelson has introduced no evidence showing that any inmate who crossed the picket line was assaulted for doing so either during or after the strike.

Second, as described above, prison officials took steps to minimize the risk of violence both during and after the strike, keeping the prison on

lockdown during the strike and implementing a risk assessment during the gradual return to normalcy.  Given these precautions, as an objective matter the actual risk of harm was not substantial.

There is, in short, no evidence to support the inference that there was a substantial risk that any of the strikers' threats would be carried out.  *See Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081–82 (9th Cir. 1996) ("[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment.").

The undisputed facts establish that Nelson did not cross the picket line, that those who did were not subject to a substantial risk of serious harm, and that Peck did not act with deliberate indifference to any risk that existed.  Summary judgment in favor of Peck is therefore proper on Nelson's Eighth Amendment claim.

### V.  Conclusion

Under the facts taken in the light most favorable to him, Nelson cannot show that an Eighth Amendment violation occurred.  As to the subjective prong, Nelson cannot show that Peck "disregard[ed] an excessive risk to inmate health or safety," *Farmer*, 511 U.S. at 837.  Under the objective prong, Nelson cannot show that he was subject to "a substantial risk of serious harm," *Farmer*, 511 U.S. at 834.  On the contrary, the record shows that Peck tried to

minimize that risk and apparently was successful.

For the foregoing reasons, Peck's summary judgment motion is GRANTED.

Dated: July 18, 2012          /s/ Marsha S. Berzon

MARSHA S. BERZON

United States Circuit Judge, sitting by designation